UNITED STATES of America, Appellee,

v.

Nick DiPAOLO and Edward Weather, Appellants.

Nos. 157, 320, Dockets 87–1206, 87–1222.

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 1987.

Decided Dec. 10, 1987.

Ronald S. Carlisi, Rochester, N.Y., for appellant DiPaolo.

George W. Conaty, Rochester, N.Y., for appellant Weather.

Frederick C. Emery, Asst. U.S. Atty. (Roger P. Williams, U.S. Atty. for the W.D. N.Y., Jonathan W. Feldman, Asst. U.S. Atty., of counsel), for appellee.

Before OAKES, CARDAMONE and MAHONEY, Circuit Judges.

OAKES, Circuit Judge:

Nick DiPaolo and Edward Weather appeal from an order of the United States District Court for the Western District of New York, Thomas C. Platt, Jr., Judge, sitting by designation, denying their motions for a new trial pursuant to Federal Rule of Criminal Procedure 33 and for an order granting a hearing on those motions, 659 F.Supp. 120. DiPaolo and Weather argued to the district court and argue here that Joann Barone, a central prosecution witness at their trial for conspiracy and witness intimidation, had recanted her testimony and that the Government had withheld information favorable to the defendants. They contend that the trial judge abused his discretion in denying the motions for a new trial and in refusing to grant a hearing on the motions. We affirm.

## I. BACKGROUND

The facts underlying the defendants' convictions and the significance of Joann Barone's testimony are set forth in detail in this court's opinion, *United States v. DiPaolo*, 804 F.2d 225 (2d Cir.1986). We provide only a brief review here.

On April 19, 1984, a United States Postal Service contract carrier was hijacked and robbed. In late February 1985 Lucille Barone told two Rochester police officers, Donald Agnello and James MacNamara, that she had information about the robbery. She had met the two officers at the Princess Restaurant where she worked as a waitress and where they ate frequently. Soon thereafter, Nick DiPaolo, her boyfriend, as well as Edward Weather and Paul Snyder, began accusing her of providing information to the police about the postal truck robbery. The first instance occurred in mid- or late February at D.J.'s Lounge, a Rochester bar. DiPaolo told Barone that she could "get into big trouble by talking to the police so much." Weather told DiPaolo in front of Barone to "make sure she understands that [she] could get seriously hurt" if she were a police infor-

48

mant. Snyder told Barone that "this was not a joke." After this incident, Barone stressed to DiPaolo that she was not a police informant.

Barone continued to work at the Princess Restaurant and to talk with the two police officers. DiPaolo, Weather, and Snyder repeatedly warned her against being a police informant, using verbal threats and physical force. In late February or early March, DiPaolo confronted Barone in her home and said that "Mr. Weather and the Hell's Angels would not really appreciate [her] going around blabbing to the police" and that she "could get her legs broken." Barone knew that Weather was a member of the Hell's Angels and that Snyder and DiPaolo associated with members of the Hell's Angels. DiPaolo slapped Barone in the back of her head and said, "We're not kidding. This is no joke."

Several days later, when Barone was home alone, Snyder forced his way into her home, pushing the door open so that it hit her in the side of the face. He said that she was a "cop lover" and that she was not "taking their threats very well about talking to the police." He then raped her, after which he said that "next time he wouldn't be so nice."

During this time, Officer Agnello was meeting Barone on a regular basis attempting to persuade her to discuss the robbery with postal inspectors and to obtain protection for herself and her family. In late February he noticed marks and bruises on her face and neck. On the morning of March 22, 1985, Barone called Officer Agnello at approximately 1:00 a.m., soon after DiPaolo had left her home. She was very scared and crying. Officer Agnello drove Barone to the Ramada Inn Hotel where they discussed the possibility of police protection with several New York State police officers, Rochester police officers, and postal inspectors. Barone returned to her home at 4:00 a.m., with Officers Agnello and MacNamara. DiPaolo and Weather were standing in her kitchen. After they refused to leave the area, Weather and DiPaolo were arrested. On March 22,

1985, Barone and her children entered protective custody.

Later that day, DiPaolo confronted Carol Barone, Lucille's sister, at the Nortonian Nursing Home where she worked. Carol and her seven-year-old daughter, Christie, lived with Lucille and her children. DiPaolo said that he was looking for Lucille Barone but could not find her. He also said that he had gone to "see the kids at school but they weren't there." At trial, a friend of Carol Barone's testified that DiPaolo had never picked up the children from school. On March 23, Carol Barone and her daughter entered protective custody.

Joann Barone, Lucille's sister-in-law, was DiPaolo's next target. On April 15, 1985, Joann Barone was standing in her front yard with her two small children when a tan car pulled in front of the house. DiPaolo exited from the passenger side carrying a screwdriver. He struck Barone's face several times with the handle of the screwdriver. As he was beating her, DiPaolo told her to tell her husband, John Barone, and his brothers "to keep out of Lucille's business." He added that if she told anybody about the incident, he would return and hurt her children. Photographs of Joann's face after the assault were introduced in evidence. Joann Barone filled out and signed a police report wherein she described her assailant as a white male, twenty-five years old, dark complexion, heavy build, wearing jeans, a white T-shirt, and a black jacket. She noted that he had been a passenger in a tan car. Peter Palumbo, a close friend of DiPaolo, later testified that on April 15 he saw DiPaolo in the passenger's side of a tan car near Barone's house, wearing clothes matching the description given by Barone.

Four days later, on April 19, Joann Barone described the assault under oath before United States Magistrate David G. Larimer. On April 21, 1985, four days before DiPaolo's bail revocation hearing, Joann Barone was again assaulted while she was sitting on the porch with her children. The unknown male assailant told her "not to testify against Nick DiPaolo." Thereafter,

Joann Barone and her children entered protective custody. She reiterated her testimony before Magistrate Larimer on October 18, 1985, and again during the trial of DiPaolo, Weather, and Snyder on October 23 and 24, 1985.

On October 25, 1985, DiPaolo, Weather, and Snyder were convicted of four felony counts involving conspiracy in violation of 18 U.S.C. § 371 (1982) and witness intimidation in violation of 18 U.S.C. § 1512 (1982). DiPaolo was also convicted of criminal contempt in violation of 18 U.S.C. § 401 (1982). The defendants' convictions with respect to counts three and four of the indictment and DiPaolo's conviction for criminal contempt involved DiPaolo's April 15 assault on Joann Barone. After sentencing, they appealed. On May 23, 1986, the Second Circuit Court of Appeals heard oral argument and on October 31, 1986, rendered a unanimous decision affirming the convictions and sentences. *United States v. DiPaolo*, 804 F.2d 225.

On March 4, 1987, DiPaolo and Weather filed motions for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. They alleged that on May 16, 1986, Joann Barone's brother, Steve Hockmeyer, gave a statement to Charles Schiano, Weather's counsel on appeal, detailing Joann Barone's alcohol and psychiatric problems and suggesting that she may have falsely named DiPaolo as her assailant, and that on July 16, 1985, Joann Barone made a statement of recantation to Attorney Schiano. On April 23, 1987, the district court issued a memorandum decision and order denying the motions. This appeal ensued.

## II. DISCUSSION

■ Motions for a new trial based upon newly discovered evidence are "'granted only with great caution,'" *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975) (quoting *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.), *cert. denied*, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958)), *cert. denied*, 429 U.S. 819, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976), in "'*the most extraordinary circumstances.*'" *United*

*States v. Ochs*, 548 F.Supp. 502, 512 (S.D. N.Y.1982) (quoting *United States v. Fassoulis*, 203 F.Supp. 114, 117 (S.D.N.Y.1962) (Weinfeld, J.)), *aff'd*, 742 F.2d 1444 (2d Cir. 1983). Courts are particularly reluctant to grant such motions where the newly discovered evidence consists of a witness recantation as such recantations are "looked upon with the utmost suspicion." *United States ex rel. Sostre v. Festa*, 513 F.2d 1313, 1318 (2d Cir.) (quoting *United States v. Troche*, 213 F.2d 401, 403 (2d Cir.1954) (quoting *Harrison v. United States*, 7 F.2d 259, 262 (2d Cir.1925))), *cert. denied*, 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975). Accordingly, before granting a motion for a new trial on the ground that a witness recanted her trial testimony, a trial court must be satisfied (1) that the testimony recanted was false and material, *Sostre*, 513 F.2d at 1317; *United States ex rel. Rice v. Vincent*, 491 F.2d 1326, 1331 (2d Cir.), *cert. denied*, 419 U.S. 880, 95 S.Ct. 144, 42 L.Ed.2d 120 (1974); (2) that without the original testimony the jury probably would have acquitted the defendant, *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980); *Stofsky*, 527 F.2d at 246; and (3) that the party seeking the new trial was surprised when the false testimony was given or did not know of its falsity until after the trial, *Sostre*, 513 F.2d at 1317; *Rice*, 491 F.2d at 1332; and could not with due diligence have discovered it earlier. *Alessi*, 638 F.2d at 479; *Ochs*, 548 F.Supp. at 512. The defendant bears the burden of satisfying this three-part test. *See United States v. Brown*, 582 F.2d 197, 202 (2d Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978); *United States v. Cruz*, 602 F.Supp. 825, 829 (S.D.N.Y. 1985); *Ochs*, 548 F.Supp. at 512.

■ To demonstrate the falsity of Barone's prior testimony, DiPaolo and Weather primarily rely on the recantation statement itself. They contend that the recantation establishes that Barone's trial testimony falsely identified DiPaolo as her assailant and significantly minimized her drinking and psychiatric problems. However, the recantation, which consists of a transcript of Schiano's interview of Barone, is unper-

suasive. Schiano consistently asked leading questions.[1] Barone's responses were equivocal, implausible, and frequently consistent with her statements to the police and her trial testimony. The following is an excerpt from the recantation:

SCHIANO: Then, I have to ask you, why did you say it was Nick DiPaolo?

BARONE: At the time I believed it was him. I guess.

SCHIANO: Well, did it look like him?

BARONE: I don't even know, I can't remember what happened that day.

SCHIANO: Well, could it have been Nick DiPaolo?

BARONE: No.

SCHIANO: Why are you so certain?

BARONE: Because I just know it's not. I mean as far as I know I could have done those bruises myself for all I know.

Barone concedes that at the time of the assault she believed that her assailant was Nick DiPaolo. She claims to have forgotten what happened the day of her assault and implausibly suggests that "as far as I know I could have done those bruises myself for all I know." In his memorandum denying the defendants' motions for a new trial Judge Platt noted "the virtual physical impossibility of Joann Barone's inflicting the wounds to her own face which are shown in photographs introduced into evidence at the trial."

The recantation also does not establish that Barone falsely described her drinking and psychiatric problems. In this court's opinion affirming the defendants' convictions, we rejected the defendants' contentions that their cross-examinations of Barone were overly restricted because the trial court declined to permit cross-examination regarding her use of alcohol. *United States v. DiPaolo*, 804 F.2d at 229–30. We noted that while it is proper to determine whether a witness was under the influence of drugs or alcohol at the time she observed the events in dispute or at the time she is testifying, a general habit of intemperance reveals nothing about a witness's testimonial incapacity and therefore is inadmissible. *Id.* Barone had testified in camera that although she had had a drinking problem for two years, there were periods of time in which she did not drink including the day DiPaolo assaulted her and the days of her testimony. Barone's recantation merely reaffirms that she suffered from chronic alcoholism and that she was not drinking heavily before or during the trial.

Even if Barone's recantation clearly disputed her trial testimony, its credibility is doubtful because the transcription of the taped interview was never initialed, signed, or sworn to by Barone. She never signed the last page of the transcript entitled "certification" and dated "January of 1986," nor did she initial each page of the transcript as claimed in the certification. The failure of a defendant to produce or explain the absence of an affidavit of a recanting witness may be sufficient grounds for denying a motion for a new trial. *See United States v. Ward*, 544 F.2d 975, 976 n. 2 (8th Cir.1976) (per curiam).

In contrast to the alleged recantation, Barone's testimony before Magistrate Larimer and before Judge Platt was detailed, consistent, and under oath. During the trial, Judge Platt had the opportunity to observe Barone's demeanor, question her about her drinking and assess her credibility. *See United States v. Adi*, 759 F.2d

---

1. The following excerpt from the transcript of Barone's recantation illustrates the pattern of Schiano's leading questions followed by Barone's equivocal responses:

SCHIANO: What I would like to ask you Miss Barone is that you never filed a police report about these beatings?

BARONE: I called the police, they came to my house, I wrote out a report but I didn't want to press any charges.

SCHIANO: Why did you call the police?

BARONE: I think my husband made me. I can't remember.

SCHIANO: But in those police reports you didn't mention anybody's name?

BARONE: No.

SCHIANO: That's because you knew there was nobody really guilty, isn't that right?

BARONE: Uh huh.

SCHIANO: You had self-inflicted these but your husband wanted you to file a report, is that right?

BARONE: Right, and I mean he didn't believe that I could do something like that to myself.

SCHIANO: But you knew you had?

BARONE: Yes.

404, 409 (5th Cir.1985). In passing on the credibility of her recantation, he "utilize[d] the knowledge he gained from presiding at the trial as well as the showing made on the motion." *United States v. On Lee*, 201 F.2d 722, 723 (2d Cir.), *cert. denied*, 345 U.S. 936, 73 S.Ct. 798, 97 L.Ed. 1364 (1953). He properly considered the fact that the assault took place only weeks after DiPaolo threatened Joann Barone's sisters-in-law and that DiPaolo's friend testified under oath that DiPaolo was near Joann Barone's home at the time of the assault wearing clothes matching Barone's initial report.

DiPaolo and Weather clearly did not satisfy the first requirement for granting a motion for a new trial—establishing the falsity of the trial testimony. Nor can they show that after learning of the recantation, they brought it to the court's attention with due diligence. According to DiPaolo, he learned that Barone had recanted in May 1986, a week before oral argument before the Second Circuit, yet he did not file a motion for a new trial until March 4, 1987, after the Second Circuit rendered its decision affirming the convictions. It is hardly due diligence to wait ten months before alerting the court to a recantation. *See, e.g., Ochs*, 548 F.Supp. at 513 (thirteen months between discovery of evidence and filing motion for new trial defeats motion). As DiPaolo and Weather neither satisfied the first nor the third requirement for a new trial, the trial judge did not abuse his discretion in denying their motions.

■ Nor did the trial judge abuse his discretion in refusing to grant a hearing on the motion for a new trial. When a motion for a new trial is predicated entirely on an affidavit from a trial witness who recants her testimony, a trial judge can ordinarily deny it without a hearing. *Davis v. Blackburn*, 789 F.2d 350, 352 (5th Cir.1986); *see also United States v. Persico*, 339 F.Supp. 1077, 1083 (E.D.N.Y.), *aff'd on opinion below*, 467 F.2d 485 (2d Cir.1972), *cert. denied*, 410 U.S. 946, 93 S.Ct. 1360, 35 L.Ed. 2d 613 (1973). The need for a hearing is diminished when, as here, the judge observed the demeanor and weighed the cred-

ibility of the witness at trial. *Ward*, 544 F.2d at 976.

DiPaolo and Weather's final argument that the Government withheld information regarding Barone's alcoholism, psychiatric treatment, and suicide attempts is meritless. This contention was considered and dismissed by the trial judge and by this court on appeal. *See United States v. DiPaolo*, 804 F.2d at 229–30. We see no reason to reexamine the issue.

Accordingly, we affirm the order denying the motion for a new trial.